No. 33,203

W. H. KEMBLE, *Appellant,* v. D. G. HANSEN, *Appellee.*

(65 P. 2d 249)

Opinion filed March 6, 1937.

*J. T. Reed* and *W. S. Rice,* both of Smith Center, for the appellant.

*T. D. Relihan* and *A. W. Relihan,* both of Smith Center, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This was an action for treble damages for trespass on real property. The trial court made findings of fact and rendered judgment for defendant. Plaintiff has appealed.

Briefly stated, the record discloses the following: Plaintiff, W. H. Kemble, is a resident of Bristol, Va. He owns a described 40-acre tract of land near Almena, in Norton county, and also owns other property in that vicinity. His father, C. S. Kemble, lives in or near Almena and sometimes looks after business matters connected with plaintiff's property in that vicinity. But he was more than 80 years of age, and some matters connected with plaintiff's property were referred, either by plaintiff or his father, to Leonard Lovejoy, a banker at Almena, who gave them attention. The defendant, D. G. Hansen, resides at Logan. His business, in part at least, is that of

a road contractor. Late in 1931 he obtained a contract from the State Highway Commission to gravel several miles of a state highway near Almena. He made tests in that vicinity to locate a suitable gravel pit and found one on the 40-acre tract belonging to plaintiff. There the gravel was exposed in a deep draw, and tests showed it extended back into the banks of the draw, where it was covered with several feet of dirt. Defendant's foreman interviewed C. S. Kemble with a view of getting permission to use gravel from this tract, and was referred by him to Lovejoy. On December 9 Lovejoy wrote plaintiff about some other business matters and in the course of the letter advised him that a party with a contract to gravel a stretch of highway wanted to get the gravel rights on this 40-acre tract and would pay $100 per year for two years, and not disturb the tilled land. He mentioned the dirt that would have to be moved in order to get to the gravel and the necessity of the right of ingress and egress. Replying to this letter, plaintiff wrote Lovejoy:

"With reference to the sand pit, I will be very glad to rent this on the basis you have named but, of course, I would expect to draw up a contract protecting me and my rights in the matter. If they have a contract of their own, will you please pass on it and send it to me when convenient?"

Assuming this letter gave him authority to do so, Lovejoy, on December 16, executed a contract with Hansen which gave him the right to take gravel from the 40-acre tract for a period of two years for $125 per year. Hansen gave his check to Lovejoy for $125, which Lovejoy deposited in his bank to the credit of plaintiff and sent plaintiff a deposit slip for it. Previous to that time plaintiff did not have an account at that bank, and Lovejoy had no specific authority to open one for him. Plaintiff has at all times since retained the deposit slip but has not in fact made any use of the bank's credit shown by it. On December 10 plaintiff's father wrote plaintiff about the gravel pit and that someone had been there to get the gravel from it; stated he was afraid plaintiff would not know how to price it, and suggested that plaintiff let his father know before he did price it.

Plaintiff replied to that letter and advised his father about his correspondence with Lovejoy. C. S. Kemble wired his son on December 16: "Don't lease sand pit until you hear from me;" and perhaps wrote him on that date, and received an answer that he had not leased, but was awaiting his father's advice. On December 19 C. S. Kemble wired plaintiff: "Let me know at once by wire if you have leased sand pit." On December 20 plaintiff wired C. S. Kemble:

"Telegram and special received. I have signed no contract for sandpit. Lovejoy was to send one for my approval. Stop them if they are hauling or working pit. Tell them they must make contract with you. You are my exclusive agent. Wire night letter what they decide to do."

C. S. Kemble received this telegram and showed it to Lovejoy and to defendant's foreman. Defendant had taken equipment to the 40-acre tract and was getting ready to take gravel out, but on being advised of this telegram his foreman ceased operations. Within the next few days there were further telegrams and letters between plaintiff and Lovejoy and C. S. Kemble, details of which need not be noted at present. There is some conflict in the testimony as to just what transpired among the parties at Almena within the next few days after December 20. The testimony, apparently believed and relied upon by the court, may be summarized as follows: Hansen was advised by his foreman of the telegrams received by C. S. Kemble December 20 and went to Almena, where he met and talked with C. S. Kemble, where he was staying, with Mr. and Mrs. House, and also talked with him and Lovejoy at the bank. In this conversation C. S. Kemble was contending defendant had no valid contract to take gravel from the property, and defendant was arguing that he did have, and stated that he wanted to use the gravel, and if he didn't have a valid contract he would make another one with C. S. Kemble. As a result of this conversation it was agreed to let L. H. Wilder, a well-known, reputable attorney at Norton, pass upon the validity of the contract that had been made, and if in the judgment of Wilder the contract was valid defendant should go ahead and operate under it. If Wilder decided otherwise, new arrangements would have to be made. Defendant was not personally acquainted with Wilder. His name was suggested by C. S. Kemble. Wilder had been looking after some legal matters for plaintiff.

C. S. Kemble and defendant went together to Mr. Wilder's office at Norton, showed him the contract and the correspondence with plaintiff, and asked his opinion as to the validity of the contract. After fully considering the matter Wilder advised them that in his judgment the contract was valid. C. S. Kemble seemed irritated with this advice, but he and defendant returned to Almena. Defendant went forward with the work of taking gravel. Neither the plaintiff nor C. S. Kemble made any specific objection thereto, although both of them knew it was being done and both of them were on the premises and saw the work going on as many as two or

three times. After the work had been going on for a year defendant gave another check to Lovejoy for $125, which Lovejoy deposited in his bank to plaintiff's credit and sent him the deposit slip therefor. Sometime thereafter plaintiff's attorney advised the bank that plaintiff repudiated that deposit and claimed nothing by virtue of it. Defendant continued to remove gravel from the pit until he had removed about 17,000 cubic yards.

This action was filed about January 1, 1933. Defendant's answer, among other things, alleged Lovejoy was plaintiff's agent for the purpose of executing the lease, and set out the facts as to how it was executed. Plaintiff at first filed a reply to the answer, but later, by leave of court, got permission to withdraw the reply and demurred to the paragraph of the answer which related to the agency of Lovejoy. It was stipulated that the questions to be submitted to the court upon the demurrer be limited solely to whether the letter set out as a part of the answer conferred legal authority upon Lovejoy to execute the lease. Upon a hearing the trial court sustained the demurrer, holding that the letters had not conferred such authority on Lovejoy, and on appeal to this court that ruling was affirmed. (*Kemble v. Hansen*, 140 Kan. 565, 37 P. 2d 1003.) After that decision the pleadings were amended somewhat and the case went to trial. Among other things the court found that plaintiff's telegram of December 20, 1931, previously quoted herein, together with other letters and telegrams, made C. S. Kemble plaintiff's general agent for the purpose of dealing with defendant with respect to taking gravel from the tract of land in question. The court further found that in pursuance of that authority C. S. Kemble had agreed with defendant to abide by the judgment of Mr. Wilder, and if Wilder thought the contract executed by Lovejoy for plaintiff with defendant was valid he should go ahead and operate under it. There was a conflict in the evidence as to whether C. S. Kemble made that agreement with defendant, but there is an abundance of substantial, competent evidence to sustain the finding of the court that he did so.

Although it is argued in detail and from several angles, plaintiff's main contention in this court is that his telegram of December 20 did not make his father, C. S. Kemble, his general agent for the purpose of negotiating with defendant and making a final agreement with him respecting the taking of gravel from the land in question. The contention is that only a limited authority was given

and that nothing in any of his letters to C. S. Kemble extended that authority. While the authority given in the telegram is quite comprehensive there are excerpts from some of plaintiff's letters indicating he meant the authority conferred to be complete. In his letter to C. S. Kemble of December 28 this appears:

"After I wired you to take full control of this situation, and handle it for me, he [Lovejoy] called me up over long-distance telephone and I told him I had turned the matter over to you to handle."

And in his letter of January 5, 1932, to C. S. Kemble, speaking of what he had told Lovejoy over the telephone, he states he told him, among other things, "to take it up with you as you had full charge of it and anything you did was satisfactory to me." Plaintiff's view of the authority he was conferring upon his father in relation to the matter is shown by the testimony he gave in this case as follows:

"Q. In addition to that you immediately wrote your father that he was to take full charge of this thing? A. No, sir, I wired him.

"Q. You wrote him, too? A. I wired him; I may have written; I wired him, giving him the authority to represent me in the matter. . . .

"Q. He had full authority to handle this in any way he wanted? A. Yes, sir.

"Q. That was your understanding of it? A. Yes.

"Q. Your father was to have complete handling of that thing, and to order him to stop if he wanted to, or anything else? A. Yes, sir.

"Q. Or anything else that he wanted to do? A. Yes, sir."

We think the telegram, letters and this evidence justified the court in finding that plaintiff had granted to C. S. Kemble full general authority to represent him in dealing with defendant concerning this matter. The trial court found defendant acted in good faith in dealing with plaintiff and that he had paid or tendered the sum which he had agreed to pay, and adjudged plaintiff entitled to the sum of $250, which defendant had paid and which had been deposited to plaintiff's credit at Almena, or if he would cancel his right thereto that defendant should pay to him that sum.

The above points are the controlling ones in this action. While they are argued from several angles, and details stressed, we find it unnecessary to treat these separately. We find no error in the record. The judgment of the court below is affirmed.